[Civ. No. 20097. First Dist., Div. One. Jan. 14, 1963.]

UNITED AIR LINES, INC., Plaintiff and Respondent, v. INDUSTRIAL WELFARE COMMISSION et al., Defendants and Appellants.

Stanley Mosk, Attorney General and B. Franklin Walker, Deputy Attorney General, for Defendants and Appellants.

Brobeck, Phleger & Harrison for Plaintiff and Respondent.

BRAY, P. J.—Defendants appeal from an adverse "Declaratory Judgment and Decree of Permanent Injunction."

## QUESTIONS PRESENTED

Is section 9(a) of order of the commission 9-57 of 1957 inapplicable to plaintiff——

1. Stewardesses——

(a) because of the preemptive effect of the federal Railway Labor Act;

(b) because of the commerce clause of the federal Constitution?

2. Ticket Agents.

3. Stewardesses and Ticket Agents——

(a) because under state law the order is beyond the power of the commission to issue;

(b) because the procedural steps in regard to the promulgation of such orders was not followed?

## RECORD

In 1957 defendant Industrial Welfare Commission by its order 9-57 revised order 9-52 of 1952. Pertinent here is section (9) (a) of the revised order which reads: "No employee shall be required to contribute directly or indirectly

from the wage for the purchase or maintenance of uniforms. The term 'uniform' includes wearing apparel and accessories of distinctive design or color required by the employer to be worn by the employee as a condition of employment.'' (Cal. Admin. Code, tit. 8, § 11460 (9) (a).)

The Director of Industrial Relations, awaiting an opinion of the Attorney General as to the validity of said section, suspended its operation. (In February 1959, the Attorney General issued an opinion to the effect that the section was valid.) In 1960 plaintiff brought this proceeding in declaratory relief to determine the validity, effect and interpretation of the section and for injunctive relief against its enforcement. The trial court found that the commission lacked jurisdiction and authority to promulgate said section; that said section is invalid, and that application of section (9) (a) would cause plaintiff irreparable injury. As alternative grounds of decision, the court held that federal law, in particular the Railway Labor Act (45 U.S.C.A. § 151 et seq.) has preempted the field of regulation sought to be covered by section (9) (a) and that application of that section ''would impose an undue and unlawful burden on interstate commerce and would result in a constitutionally prohibited extraterritorial application of state law.''

Thereupon the court entered judgment holding section (9) (a) invalid, and restraining defendants from enforcing the section as against plaintiff.

The action was tried on stipulated facts. The pertinent ones follow:

United Air Lines is engaged in interstate and foreign commerce as a common carrier. United transports persons, property and mail to and from approximately 66 cities in the United States and Canada. Sixteen of these cities are located in California. United is a Delaware corporation with its principal executive offices established in Chicago and its operational headquarters and superintendent of stewardess service located in Denver, Colorado.

United's air routes total 11,613 miles, of which 1,342 or 11.5 per cent are route miles in California. The remainder are interstate and foreign route miles. During the year ended June 30, 1960, the total revenue passenger miles flown by United totalled 5,154,586.000, of which 307,334.029 revenue passenger miles or 5.96 per cent represented California intrastate miles, i.e., those where passengers began and ended their journeys in California.

As of July 15, 1960, United had in its employ approximately 1,267 stewardesses, of whom approximately 527 were based in California, in that they were domiciled and paid in this state. Many of the stewardesses based in California are assigned to and work on United's interstate flights, spending but little of their working time within California. Even stewardesses assigned primarily to intrastate flights within California habitually spend a portion of their time on interstate flights. United also employs other stewardesses who are not domiciled or paid in California but who enter the state in the course of interstate flights and spend a portion of their working time in California. The total systemwide scheduled hours for United's stewardesses in the month of August, 1960, was 87,470 stewardess-hours. Of this total there were scheduled 4,235 stewardess-hours, or 4.84 per cent on intrastate flights in California.

As of July 15, 1960, United had stewardesses based at San Francisco, Los Angeles, Washington, D.C., Boston, Newark, Philadelphia, New York, Chicago, Denver, and Seattle. During the period August 31, 1959, through August 31, 1960, 185 United stewardesses transferred from out-of-state domiciles to California domiciles and 77 transferred from California domiciles to out-of-state domiciles. Such transfers do not include 310 stewardesses who became domiciled in California during said period after completing their training at United's stewardess training center in Cheyenne, Wyoming.

As of July 15, 1960, United had in its employ approximately 368 female ticket agents, of whom approximately 112 were working in offices of United located in California. A major portion of the time of the female ticket agents is spent in arranging and selling tickets for interstate and foreign transportation on United's system, or a combination thereof with connecting service on systems of other carriers. All ticket agents and stewardesses based in California are paid their salaries by checks drawn on California banks and delivered to them.

United requires that its stewardesses and female ticket agents wear uniforms. As to stewardesses, the terms regarding the cost of acquisition and maintenance are covered by a systemwide collective bargaining agreement made and entered into between United and its stewardesses, as required by the federal Railway Labor Act. This collective bargaining agreement specifically provides that the cost of the uniform is to

be borne in part by the stewardess, either directly or by deduction from wages, at the option of the individual stewardess, and in part by United. United provides without expense to the stewardess for the cleaning of uniforms and also takes care of in-flight damage to uniforms.

There is no collective bargaining agreement in effect with respect to United's female ticket agents. Generally, the arrangement provided by United's regulations for female ticket agents is the same as that accorded the stewardesses by their collective bargaining agreement, the cost of the uniform being borne in part by the female ticket agents, either directly or by deduction from wages, and in part by United.

The salaries paid by United to stewardesses and female ticket agents are substantially in excess of the minimum wages required to be paid by the laws of the State of California and any regulation or order issued pursuant thereto by any state administrative agency, including the Industrial Welfare Commission, and the minimum wage established by the Fair Labor Standards Act (29 U.S.C.A. § 201 et seq.) for employees engaged in interstate commerce. The effective rate of pay is not reduced below the applicable minimum wage by reason of payments for uniforms and their maintenance by stewardesses and female ticket agents.

The Industrial Welfare Commission over the years has enacted four orders respecting minimum wages, maximum hours and standard working conditions for women and minors in the transportation industry. The 1957 revision of order 9-52 of 1952 was part of a general revision of all the then existing orders of the commission.

In 1956 the commission submitted order 9-52 to several wage boards for reconsideration. One of these was the Transportation Industries Wage Board. Following the public hearings hereinafter described, the commission proceeded to write a new series of orders. The commission did not separately hear or consider reenactment, amendment and adoption of each individual minimum wage order but the proceedings were conducted simultaneously with respect to amendment and adoption of all the existing orders.

The commission in 1952 and 1957 accepted many of the changes in the orders recommended by one or more of the various wage boards. The commission also departed in numerous instances from the recommendations of the wage boards by rejecting specific recommendations. In some instances it

made changes in sections of the orders even though the particular wage board either recommended no change in those sections or was silent as to those sections.

The wage boards did not recommend any amendment to section (9) (a) in respect to payment for uniforms. No notice referring specifically to the possibility of amending section (9) (a) was ever published and no public hearing was ever held at which amendment to section (9) (a) as to payment for uniforms was discussed nor was any evidentiary finding ever made in support of the amendment.

Order 9-57 was published as required by law during the month of September, 1957. Following the issuance of the Attorney General's opinion on February 27, 1959, defendant Florence G. Clifton, Chief of the Division of Industrial Welfare, called a meeting on July 2, 1959, of representatives of certain airlines operating in California concerning enforcement of section (9) (a) of order 9-57. The representatives of the airlines, including United, took the position that the section was neither valid nor applicable as against them.

1. STEWARDESSES. (a) *Preemption.*

■■ All of the provisions of sections 1, 2 and 4-13 of the Railway Labor Act (45 U.S.C.A. §§ 151, 152, 154-163) are made applicable to air carriers engaged in interstate or foreign commerce. (45 U.S.C.A. § 181.)

The purposes of the act are stated in 45 U.S.C.A. section 151a. They are: (1) to avoid any interruption of commerce or the operation of carriers, (2) to forbid any limitation upon freedom of association among employees or the denial of employees' rights to join labor organizations, (3) to provide for the complete independence of carriers and employees in the matter of self-organization to carry out the purposes of the act, (4) to provide for the prompt and orderly settlement of all disputes concerning the rates of pay, rules, or working conditions, and (5) to provide for the prompt and orderly settlement of all disputes growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions.

■ United is required by the act to bargain collectively, where the employees desire it, regarding such matters as rules, wages and working conditions. Section 2 (45 U.S.C.A. § 152) makes it the duty of carriers and employees to exert every reasonable effort to make and maintain these agreements. The section also provides that no carrier shall change the rates of

pay, rules, or working conditions of the employees as a class embodied in the agreement except as the agreement or section 156 prescribes. Section 6 (45 U.S.C.A. § 156) sets forth an elaborate procedure for the changing of agreements.

Defendants have interpreted section (9) (a) as applying only to females employed by plaintiff in California, that is, only to the ticket agents who work in the company's California offices and to stewardesses who are based in California. Defendants make no contention that we should consider that section as applying otherwise.[1] They contend further that as there is no bargaining agreement between plaintiff and the ticket agents, the question of federal preemption cannot apply to them, and must be considered only as to the stewardesses.

The following discussion applies only to the situation concerning the stewardesses. The situation concerning the ticket agents will be discussed later.

As hereinbefore stated, the Railway Labor Act requires an air carrier to bargain collectively, where the employees desire it, regarding such matters as rules, wages and working conditions. It seems conceded that the regulation is not one intended to concern rules or wages. It likewise seems conceded that it is intended to concern "working conditions" only. On the face of the Railway Labor Act there has been a federal preemption where there is, as here, a bargaining agreement as to working conditions.[2] However, defendants claim that by decision it has been held that in spite of its language the act does not preclude a state from establishing minimum regulations in the interest of rail and air carrier employees. An examination of the authorities cited, however, shows that this power of the state is limited to health and safety regulations. There are no authorities to the effect that state regulations may be adopted for matters such as payment for uniforms.

The cases chiefly relied upon by defendants are *Missouri Pacific R. R. Co.* v. *Norwood* (1931) 283 U.S. 249 [51 S.Ct. 458, 75 L.Ed. 1010], *Terminal R. R. Assn.* v. *Brotherhood of*

---

[1] They apparently concede that application of the regulation to stewardesses based outside of California but flying in to California, would contravene the Railway Labor Act and would be illegal.

[2] Defendants concede that if Congress by the Railway Labor Act has preempted the field concerning the subject matter of section 9(a) then the section would be invalid. (See U.S. Const. art. I, § 8, cl. 3; *Hines* v. *Davidowitz* (1941) 312 U.S. 52 [61 S.Ct. 399, 85 L.Ed. 581]; *Garner* v. *Teamsters, Chauffeurs & Helpers Local Union* (1953) 346 U.S. 485 [74 S.Ct. 161, 98 L.Ed. 228]; *San Diego Bldg. Trades Council* v. *Garmon* (1959) 359 U.S. 236 [79 S.Ct. 773, 3 L.Ed.2d 775].)

*R. R. Trainmen* (1943) 318 U.S. 1 [63 S.Ct. 420, 87 L.Ed. 571], *De Veau* v. *Braisted* (1960) 363 U.S. 144 [80 S.Ct. 1146, 4 L.Ed.2d 1109], and *Huron Portland Cement Co.* v. *Detroit* (1960) 362 U.S. 440 [80 S.Ct. 813, 4 L.Ed.2d 852, 78 A.L.R.2d 1294]. As will be seen from an examination of them, these cases, other than *De Veau,* all dealt with regulations concerning the health or safety of the employees, and *De Veau* dealt with waterfront crime. In *Norwood, supra,* it was held that certain Arkansas statutes regulating the number of crew members on freight trains did not conflict with the Railway Labor Act. The court held that the state regulation was necessary to "safeguard employees" against "dangers." (283 U.S. at p. 255.) In *Terminal, supra,* the Illinois Commerce Commission had passed a rule requiring a railroad operating in Illinois to put cabooses on certain trains. A contract between the carrier and its employees provided for cabooses on certain trains, but not on those to which the order applied. The order had been promulgated at the instance of the union and after the commission had held hearings and found that the additional cabooses were essential to the health, safety and comfort of the employees. The state courts sustained the order. The United States Supreme Court also held the order to be valid, finding no conflict with federal law, and holding that the Railway Labor Act was not a preemption of regulation of "working conditions" as to minimum requirements for the health, safety and comfort of the employees; that such minimum requirements laid down by the states were not set aside. The court extensively reviewed the purposes of the act, saying that the federal interest was not to regulate wages, hours or working conditions, but to see that any disagreements concerning these things do not reach the point of interfering with interstate commerce.

In *De Veau, supra,* the Legislature of the State of New York imposed qualifications for union representatives operating on the New York waterfront. It was contended that the National Labor Relations Act had preempted the field. The state legislation implemented an interstate compact between New York and New Jersey to which Congress had given approval after its own investigation of the problem. The court held that Congress had not intended to preempt the field in view of its unambiguous approval of the interstate compact and supplementary legislation in accord with its objectives, the fighting of waterfront crime. The court distinguished *Hill* v. *Florida*

(1945) 325 U.S. 538 [65 S.Ct. 1373, 89 L.Ed. 1782], where similar state legislation was struck down as conflicting with the National Labor Relations Act. The distinction was grounded on the finding of congressional intent as evidenced in *De Veau, supra,* by Congress' approval of the interstate compact, a factor absent in *Hill, supra.* In *Huron, supra,* a divided court sustained an ordinance of Detroit, Michigan, designed to suppress the emission from an interstate vessel of smoke in density and duration exceeding minimum standards established by the smoke abatement code. The court justified the ordinance as one necessary to protect the "health, life, and safety" and physical welfare of the city's inhabitants. (362 U.S. at pp. 442, 443.)

*Erie R. R. Co.* v. *Williams* (1914) 233 U.S. 685 [34 S.Ct. 761, 58 L.Ed. 1155, 51 L.R.A. N.S. 1097], dealt with a New York labor law which required employers to pay their employees semimonthly and in cash. The contention was made that this law violated the Fourteenth Amendment of the United States Constitution in depriving the railroad company and its employees of the right of contract. The court held that the right to contract was subject to the police power of a state to act for the safety and welfare of its citizens. As to the contention that such method of payment constituted a direct burden on interstate commerce, the court said that the effect of the law was purely administrative, dealing only with the employees within the state and therefore was not a burden on interstate commerce. The court further pointed out that Congress had not acted in the matter. This case is not in point where, as here, Congress has acted. It is interesting to note that in the same volume of United States reports, 233 U.S. 671, the same court, Justice McKenna writing in each instance, held void a New York labor law which provided a lower limitation of the hours of work for railroad telegraph and telephone operators than did the federal "Hours of Service Act." In doing so the court said: "[W]e considered it elementary that the police power of the State could only exist from the silence of Congress upon the subject and ceased when Congress acted or manifested its purpose to call into play its exclusive power." (*Erie R.R. Co.* v. *New York* (1914) 233 U.S. 671, 682 [34 S.Ct. 756, 58 L.Ed. 1149, 52 L.R.A. N.S. 266].)

Cases which denied the right of a state to regulate employees engaged in interstate commerce follow: *Long Island R.R. Co.* v. *Department of Labor of State of N.Y.* (1931) 256 N.Y. 498 [177 N.E. 17, 23-24], held that a state statute which was in

conflict with the wage and hour provisions of a collective bargaining agreement between a railroad and its employees was invalid, as the Railway Labor Act covered the field so that the state was entirely excluded from the field even for the purposes of regulating work which was not a part of interstate commerce. This case was cited with approval by the United States Supreme Court in *California* v. *Taylor, infra,* 353 U.S. 553, 561.

In *Railway Employes' Dept.* v. *Hanson* (1956) 351 U.S. 225 [76 S.Ct. 714, 100 L.Ed. 1112], the United States Supreme Court held that a state court had no power to enjoin the enforcement of a union shop agreement between a carrier and its employees, as the federal law was supreme, and any agreement made pursuant to it bore "the imprimatur of the federal law upon it" (p. 232) and could not be vitiated nor made illegal by any state law.

In *State of California* v. *Taylor* (1957) 353 U.S. 553 [77 S. Ct. 1037, 1 L.Ed.2d 1034], it was held that the National Railroad Adjustment Board (under the Railway Labor Act) had jurisdiction over claims based on a collective bargaining agreement between a state-owned railroad and its employees and that the terms of the collective bargaining agreement would prevail over conflicting provisions of state civil service laws. The court cited a prior opinion of the California Attorney General taking the same position (4 Ops. Cal. Atty. Gen. 300-306). The court said that in *Hanson, supra,* "involving § 2, Eleventh, of the Railway Labor Act, which permits the negotiation of union-shop agreements notwithstanding any law of any State, we stated that 'A union agreement made pursuant to the Railway Labor Act has, therefore, the imprimatur of the federal law upon it and, by force of the Supremacy Clause of Article VI of the Constitution, could not be made illegal nor vitiated by any provision of the laws of a state.'" (353 U.S. at p. 561.) The court further said: "Congress no doubt concluded that a uniform method of dealing with the labor problems of the railroad industry would tend to eliminate inequities, and would promote a desirable mobility within the railroad labor force." (P. 567.) The court distinguished the *Terminal* case, *supra,* saying that the decision was "to the effect that the Railway Labor Act did not preclude a State from establishing minimum health and safety regulations in the interests of railway employees,"

and "did not concern a conflict between federally protected collective bargaining and inconsistent state laws." (353 U.S. 560, fn. 8.) Here we have such conflict.

*International Brotherhood of Teamsters* v. *Oliver* (1959) 358 U.S. 283 [79 S.Ct. 297, 3 L.Ed.2d 312], dealt with the National Labor Relations Act. A collective bargaining agreement between a group of local unions and a group of interstate carriers prescribed a wage scale for truck drivers. It also provided as to drivers who own and drive their own vehicles that they should be paid, additionally, not less than a minimum rental for the use of their vehicles. An owner-driver brought an action to restrain the union of which he was a member and the carriers from carrying out the latter provision. The state court held that the contract provision was in violation of Ohio state antitrust laws and enjoined the defendants. The Supreme Court held, on certiorari, that the minimum rental was within the scope of collective bargaining provisions required under the National Labor Relations Act and that the state court was precluded from applying state law to prohibit the parties from carrying out an agreement reached under the provisions of the act. The court said that there was no room in the scheme of the federal labor policy as enunciated in the act for the application of state policy limiting solutions that the parties' agreements can provide to the problems of wages and working conditions. However, local health and safety regulations were distinguished. "We have not here a case of a collective bargaining agreement in conflict with a local health or safety regulation; the conflict here is between the federally sanctioned agreement and state policy which seeks specifically to adjust relationships in the world of commerce." (P. 297.) The importance of the latter quotation lies in the reference to the application of state health and safety regulations to working conditions as apparently being distinguished from other types of working conditions. Also important as applicable to section (9) (a) are the statements that applying Ohio law "would frustrate the parties' solution of a problem which Congress has required them to negotiate in good faith toward solving" and "that there is no room in this scheme for the application here of this state policy limiting solutions that the parties' agreement can provide to the problems of wages and working conditions." (P. 296.)

*Crockett* v. *Union Terminal Co.* (Tex.Civ.App. 1960) 342

S.W.2d 129, held that the Railway Labor Act preempted the field in a situation where a former employee of a carrier brought an action against the carrier for damages for alleged wrongful discharge. The court affirmed a judgment holding the action was barred under the time limitation set out in the collective bargaining agreement of the national union of which plaintiff was a member. The court rejected the contention that a Texas statute which prescribed a limitation shorter than two years applied, the reason being that the Railway Labor Act had preempted the field (quoting from *Hanson, supra,* 351 U.S. 225) even when the action was brought in state courts.

*Pan American World Airways, Inc.* v. *Division of Labor Law Enforcement* (1962) 203 F. Supp. 324, was an action brought by the airline[3] to restrain officials of the California Division of Labor Law Enforcement from conducting an investigation and hearing with respect to a dispute between the airline and the Airline Pilots Association concerning the docking of pilots' pay on account of a work stoppage. The defendants claimed the right to act under section 204 et seq. of the California Labor Code (dealing with improper conduct on the part of an employer in failing to pay wages to his employee). The court held that the Railway Labor Act had preempted the field and that jurisdiction over the controversy rested solely in the Railway Adjustment Board. (See also *Slocum* v. *Delaware, L. & W. R. R. Co.* (1950) 339 U.S. 239 [70 S.Ct. 577, 94 L.Ed. 795].)

*Williams* v. *Jacksonville Terminal Co.* (1942) 315 U.S. 386 [62 S.Ct. 659, 86 L.Ed. 914], is not applicable in that in that case there was no bargaining agreement in existence. The question there was whether a railway company operating a terminal subject to the Railway Labor Act and the Fair Labor Standards Act was required by those statutes, in the absence of a negotiated agreement, to pay "redcaps" a minimum wage irrespective of tips, or whether a plan which left the tips with the redcaps and assured them a minimum wage was valid. The court held that the plan was in compliance with the Fair Labor Standards Act and not inconsistent with the provisions of the Railway Labor Act forbidding (except as provided) changes of pay or working conditions since those

---

[3]Pan American employed about 1,000 pilots, of whom 300 were based in California.

provisions of the Railway Labor Act concerning working conditions apply only where there is an agreement reached after collective bargaining.

It appears from the foregoing cases that state regulation of working conditions of employees of carriers will be valid insofar as it relates to minimum requirements of health and safety, applying to those employees whose collective bargaining agreements are imbued with the force of federal law by virtue of the Railway Labor Act. The cases, however, do not support defendants' contention that state regulations may also relate to working conditions not related to health or safety. As to these, the Railway Labor Act has preempted the field, leaving the regulation to bargaining agreements between the employee and the employer.

Prior to 1951 the Railway Labor Act prohibited carriers and their employees from agreeing to a union shop. (45 U.S.C.A. § 152, Fifth.) The amendment (45 U.S.C.A. § 152, Eleventh; 64 Stat. 1238 (1951)) provided: "Notwithstanding any other provision of this chapter, or of any other statute or law of the United States, or Territory thereof, or of any State," a carrier may enter into a union shop agreement with its employees. Defendants contend that by specifically providing that this amendment is to override inconsistent state laws Congress indicated that state laws establishing minimum standards controlled unless there is a specific provision to the contrary. This argument is not valid in view of the cases which dealt with other sections of the Railway Labor Act containing no such specific provision, and held that the act preempted the field (e.g. *State of California* v. *Taylor, supra,* 353 U.S. 553).

Defendants' second point turns on the relationship between the Railway Labor Act and the federal Fair Labor Standards Act (29 U.S.C.A. § 201 et seq.). The Fair Labor Standards Act is a statutory minimum wage and maximum hour law. Section 213 of the Fair Labor Standards Act contains various exemptions including a specific exemption of employees of air carriers covered by the Railway Labor Act. This exemption, however, is limited to excluding only the hours provision of the Fair Labor Standards Act (29 U.S. C.A. § 213 (b)(3)). Hence, the minimum wage of the Fair Labor Standards Act is applicable to the plaintiff. A further limitation is imposed by section 218 of the Fair Labor Standards Act which provides: "No provision of this chapter or of

any order thereunder shall excuse noncompliance with any Federal or State law or municipal ordinance establishing a minimum wage higher than the minimum wage established under this chapter. . . ." (29 U.S.C.A. § 218.) As defendants contend, this seems to show that Congress considered a state law fixing a minimum wage higher than the minimum stated in the Fair Labor Standards Act to be applicable to air carriers. This, taken with the *Terminal* case, *supra,* it is urged, shows that there is nothing inconsistent between the purpose of encouraging free collective bargaining and the power of the states to fix minimum standards (health, safety, and wage) below which the agreement cannot reach. But as has been noted, a collective bargaining agreement made pursuant to the Railway Labor Act bears the "imprimatur of the federal law" (*Railway Employes' Dept.* v. *Hanson, supra,* 351 U.S. 225) and supersedes state law (*id., State of California* v. *Taylor, supra,* 353 U.S. 553), and the state power is limited to regulations concerning minimum wage, health and safety matters.

Actually the federal Fair Labor Standards Act is not here involved. That act provides, in effect, that a state may fix the minimum wages of an air carrier's employees, such as stewardesses, where the employee is "based" in the state involved. The California minimum wage which would be applicable to United employees does not exceed the minimum required by the federal Fair Labor Standards Act. United's rate of pay is in fact higher than either, and the portion of the cost of uniforms paid by the women employees does not reduce their pay below such minimums.

The regulation here does not deal with health and safety. This conclusion is reached when the terms of subsection (c) of the order are considered. That subsection provides: "When protective garments are required by the employer, or are necessary to safeguard the health of, or prevent injury to, an employee, such garments shall be provided and paid for by the employer." (8 Cal.Admin. Code, § 11460 (9)(c).)

It is to be remembered that it is subsection (a) of the order which the state is seeking to apply here. That subsection makes no pretense of speaking in terms of health or safety, but merely defines the uniform as a garment required to be worn as a condition of employment and having a distinctive design

and color. Hence, by the state's own definition the section sought here to be applied does not deal with health or safety.

As to whether the order deals with the setting or modification of a minimum wage, it is instructive to note what was said in the opinion of the Attorney General in February 1959, with regard to the order involved in the instant case. There it was said: "The present orders have no express reference to protecting minimum wages. As far as we are informed they were not adopted as devices to prevent evasion of the minimum wage by subterfuge or otherwise to facilitate enforcement of the minimum wage (cf. [citations]). Apparently the present orders were adopted by the commission to prevent harassment of employees ordered by their employers to make frequent uniform changes. This had the effect of placing the employees under a continuing burden of debt. These orders were designed to prevent this. On this basis we believe the orders are a valid exercise of the commission's power, independent of wages or hours, to fix '[t]he standard conditions of labor' under Labor Code section 1182(c)." (33 Ops. Cal. Atty. Gen. 27, 29; see also 3 Ops. Cal. Atty. Gen. 353, 355.)

 Although it is agreed that the regulation was not intended to be one concerning wages, actually it is. The real effect of the order is to increase the female employees' wages by the amount which in the absence of the regulation they would have to pay towards the cost of their uniforms. This interferes with one of the purposes of the Railway Labor Act, namely, to provide for free bargaining between employer and employees in all matters of wages, except minimum wages.

 In the foregoing opinion of the Attorney General it is stated that the regulation was " [a]pparently" adopted by the commission to prevent "harassment of employees ordered by their employers to make frequent uniform changes. This had the effect of placing the employees under a continuing burden of debt." According to defendants' brief, the average deduction for stewardesses' uniforms is $50 to $80 per year of service. This hardly would seem to place the stewardesses under any "continuing burden of debt." It is obvious that the requirement of payment of part of the cost of uniforms has not been considered by either the employees or their union to effect a "continuing burden of debt." The mere statement of a make-weight argument by the Attorney General or the commission, which is completely unrealistic on its face, cannot support the action of the commission.

■ Of course, the fact that the imposition of a standard condition of labor for the welfare of women employees affects the compensation paid does not in itself render such standard condition unlawful. The test is that of an incidental versus a primary effect or purpose. As the regulation here has no real relationship to welfare it is clear that its primary effect (although the commission disclaims that it is the primary purpose) is to affect wages, reducing the financial "burden" of the employee, although the matter of wages as to airlines in interstate commerce has been left by Congress to collective bargaining.

(b) *Commerce Clause.*

Plaintiff contends that the application of the regulation would impose an undue burden on interstate commerce. While as will hereinafter appear that burden may not be very great, nevertheless the subject is one which necessarily requires uniformity of treatment. ■■ Although the facts in the case are different from those here, the following language in *Southern Pac. Co.* v. *Arizona* (1944) 325 U.S. 761, 767 [65 S.Ct. 1515, 89 L.Ed. 1915], is applicable: "[T]he states have not been deemed to have authority . . . to regulate those phases of the national commerce which, because of the need of national uniformity, demand that their regulation, if any, be prescribed by a single authority." ■ Another way of stating the principle appears in *Hall* v. *De Cuir* (1877) 95 U.S. 485, 489 [24 L.Ed. 547] : "Uniformity in the regulations by which he [the carrier] is to be governed from one end to the other of his route is a necessity in his business, and to secure it Congress, which is untrammelled by State lines, has been invested with the exclusive legislative power of determining what such regulations shall be." (See *Morgan* v. *Virginia* (1946) 328 U.S. 373, 384, fn. 29 [66 S.Ct. 1050, 90 L.Ed. 1317, 165 A.L.R. 574].) ■ Congress has provided for uniformity in leaving the subject matter here to the free agreement of the employer and the employees.

In *Application of United Air Lines, Inc.* (Neb. 1961) 172 Neb. 784 [112 N.W.2d 414], the Nebraska Supreme Court in holding that the State Railway Commission lacked jurisdiction over the air carrier's application to make certain internal changes in its financial structure, as being an unwarranted interference with interstate commerce, said, quoting from *Morgan* v. *Virginia, supra,* 328 U.S. 373: " '. . . ■ There

is a recognized abstract principle, however, that may be taken as a postulate for testing whether particular state legislation in the absence of action by Congress is beyond state power. This is that the state legislation is invalid if it unduly burdens that commerce in matters where uniformity is necessary— necessary in the constitutional sense of useful in accomplishing a permitted purpose. Where uniformity is essential for the functioning of commerce, a state may not interpose its local regulation. . . .' '' (P. 421.) It would seem that in the matter of cost of uniforms for stewardesses, there should be uniformity throughout a carrier's system (no pun intended). The mere happenstance that a stewardess is based in California should not require her to be treated differently from stewardesses based in other states.

In *Bibb* v. *Navajo Freight Lines, Inc.* (1959) 359 U.S. 520 [79 S.Ct. 962, 3 L.Ed.2d 1003], a state law required truckers to use a mudflap, not in common use and if used in some other states, a violation of their statutes. The court held that the regulation placed an undue burden on interstate commerce. While the factual situation is considerably different from that in the instant case, the principle enunciated there, i.e., the need for national uniformity, is applicable in the airline field. Such need for uniformity in that field generally is shown in the report of the House Committee on Interstate and Foreign Commerce quoted in *State of California* v. *Taylor, supra,* 353 U.S. 553, 567-568, fn. 15.

As said in *Huron Portland Cement Co.* v. *Detroit, supra,* 362 U.S. 440, 444, ''[A] state may not impose a burden which materially affects interstate commerce in an area where uniformity of regulation is necessary.''

If the regulation is sustained a most anomalous situation results. A stewardess based in California gets a free uniform even though most, or perhaps all of her work is on interstate planes. A stewardess based outside of California who works on planes coming into California does not. Likewise, on interstate flights there might very well be two stewardesses working side by side, one with a free uniform, the other with a uniform a part only of the cost of which United paid. Again, if a stewardess based in another state and having under the collective bargaining agreement paid a portion of the cost of her uniform, is temporarily based in California, would her money have to be repaid to her? Such discrimination is bound to

cause personnel troubles and to that extent, at least, a burden on interstate commerce. The situations above mentioned point out strongly the interference of the regulation with interstate commerce and the necessity for a uniform rule throughout the carrier's system.

In the cases upholding state regulations in seeming conflict with the Railway Labor Act as well as in *DeVeau, supra,* where the conflict was with the National Labor Relations Act, it appears that the court considered there were *compelling* reasons for the state regulations, which the courts felt required a finding of no conflict with the federal acts. What *compelling* reason can be given for the regulation in question here? We can find none. As said in defendants' brief, "The sole impact of this regulation is on the pay check of the employees." How can the disregard of the bargaining contracts provided for by the Railway Labor Act in which contracts the carrier is required by that act to engage, be compelling as to stewardesses based in California, when it is not considered at all compelling as to stewardesses not based here but yet who spend considerable time here?

## 2. Ticket Agents.

The discussion hereinbefore set forth is limited to the application of section (9) (a) to the stewardesses. We will now consider its application to the ticket agents. All the cases which hold that there has been a preemption of the field by the Railway Labor Act involved situations in which there was a collective bargaining agreement. None exists here with the ticket agents. *Williams* v. *Jacksonville Terminal Co., supra,* 315 U.S. 386, holds that the inhibitions in the Railway Labor Act apply only where there is such an agreement. As to the effect of section (9) (a) as limited to female ticket agents, we can see no burden imposed on interstate commerce, except an incidental one affecting the cost of transportation, nor does there seem to be such a necessity for uniformity throughout the airline's system as exists with reference to the stewardesses.

## 3. Ticket Agents and Stewardesses.

### (a) *Power of the Commission under State Law.*

 We will next consider the authority granted the Industrial Welfare Commission by section 1182, Labor Code, the

section upon which defendants rely for authority to promulgate the order in question.

The latter section gives the Industrial Welfare Commission the power to issue orders which "fix" (a) a minimum wage to be paid to women, (b) the maximum hours which women may be required to work, and (c) "The standard conditions of labor demanded by the health and welfare of the women. . . ."

Defendants contend that the commission's power to issue the regulation in question does not come from either subdivisions (a) or (b), but from subdivision (c) as being a condition of labor demanded by the welfare of women. (As before stated it has no relationship to the *health* of women.) In determining this question section 1200, Labor Code, must be borne in mind: ". . . the standard conditions of labor fixed by the commission shall be presumed to be reasonable and lawful." (See *Kerr's Catering Service* v. *Department of Industrial Relations* (1962) 57 Cal.2d 319, 330 [19 Cal.Rptr. 492, 369 P.2d 20].)

As we have hereinbefore shown, the regulation is primarily one dealing with wages. As to the ticket agents, that makes no difference because under the interpretation of section 1182 by the Supreme Court in *Kerr, supra,* the commission's power to deal with wages is not restricted to matters which might reduce the net wage below the established minimum. (Nor would it make any difference as to stewardesses were it not for the interstate commerce situation.) In *Kerr, supra,* the court said: "We are persuaded that the construction placed upon section 1182 of the Labor Code by defendants is the reasonable and proper one, *i.e.,* that the authority conferred upon the commission by subdivision (c) is not limited to the issuance of orders which do not affect wages. . . ." (P. 325.) The court at some length discussed the public policy of the California Legislature and courts concerning employees' wages and then stated: "From the foregoing it is obvious that both the Legislature and our courts have accorded to wages special considerations other than merely fixing minimums, and that the purpose in doing so is based upon the *welfare of the wage earner.*" (P. 330; emphasis added.) Thus the court held that the commission has the power to determine under subdivision (c) "[t]he standard conditions of labor demanded by the . . . welfare of the women . . ."; that anything arising from her employment which reduces the wages

received by a woman employee affects her welfare and may be regulated by the commission.[4]

(b) *Procedural Steps.*

Plaintiff contends that the order was not enacted and promulgated in accordance with the procedure established by the Labor Code in the following claimed respects: (1) No evidentiary findings. (2) Section (9) (a) was not considered or made the basis of a recommendation by the wage board. (3) No notice was published containing the language or effect of the proposed section prior to its adoption by the commission and no public hearing by the Transportation Industries Wage Board with respect to this section was ever held.

(1) *No evidentiary findings.*

Section 1178, Labor Code, provides: "If after investigation the commission *finds* [emphasis added] that in any occupation, trade, or industry, the wages paid to women . . . are inadequate to supply the cost of proper living, or that the hours or conditions of labor are prejudicial to the health, morals, or welfare of the employee, the commission shall select a wage board to consider any of such matters. Such wage board shall be composed of an equal number of representatives of employers and employees in the occupation, trade, or industry in question; and a representative of the commission . . . . The wage board shall report and make recommendations to the commission, including therein:

"(a) An estimate of the minimum wage adequate to supply the necessary cost of proper living to, and maintain the health and welfare of women . . . engaged in the occupation, trade, or industry in question.

"(b) The number of hours of work per day in the occupation, trade, or industry in question, consistent with the health and welfare of such women . . . .

"(c) The standard conditions of labor in the occupation, trade, or industry in question, demanded by the health and welfare of such women . . . .

"Before promulgating an order relating to wages, hours or conditions of labor for the occupation, trade, or industry

---

[4]As we have shown hereinbefore this so-called "welfare," as it does not have anything to do with the health or safety of the employee, is not the type of welfare which is permitted to interfere with collective bargaining agreements of employees in interstate commerce.

in question, and after receipt of the report from the wage board, the commission shall hold a public hearing." The section then provides for two public hearings if the industry is statewide.

In order to determine all of the matters relating to the procedure of the commission, including the question of whether section 1178 as to findings was complied with, it is necessary to review the history of the commission relating to the matter of uniforms.

Order 9 NS (§ 5a) adopted in 1943 provided that no employee could be required to pay any portion of the minimum wage for uniforms or their cleaning. In 1947 this order was superseded by 9R (§ 8). It again prohibited any payment by an employee out of the minimum wage for uniforms or their cleaning. It further provided that the employer should pay for protective garments.[5] The orders of which the above sections were a part provided first for a 50 cent, later for a 65 cent per hour minimum wage for women. In the commission's December 1954 meeting a resolution of the California State Federation of Labor was considered. This resolution requested that the commission reopen its wage orders to raise the minimum wage level, which then, by the order of 1952, was 75 cents per hour. After discussion the matter was continued to the next meeting. At that meeting (March 1955) the chairman pointed out that the commission must have factual evidence to justify the reopening of orders and it was ordered that the staff collect information relative to current minimum wages and working conditions in California. At the October 1955 meeting evidence of minimum wages was presented. Testimony that no increase was needed was also heard. A motion was made to request the Department of Finance for funds for the reopening and consideration of certain commission orders including 9-52 and that upon receipt of such funds the commission "will proceed to reopen and reconsider such Orders in the manner provided by law."

Sometime in 1956 the commission submitted to the wage boards appointed by it pursuant to section 1178, Order 9-52 for reconsideration. There were wage boards for nine different classified industries, including the Transportation Industries

---

[5] In 1952 this order was superseded by 9-52. The only change in the section was to number it 9 in place of 8.

Wage Board. A brochure presented by the commission's staff to all wage boards asserted that all provisions of Order 9-52 were to be considered, but the contents of the brochure were limited almost exclusively to minimum wages for women in all trades, occupations and industries. There was also submitted a brief supplied by the California State Federation of Labor dealing only with minimum wages, and one by the California Industrial Welfare Committee dealing only with minimum wages and maximum hours of labor. Neither of the briefs mentioned the uniform provision or uniforms. It is stipulated that section (9)(a) was not considered by the board nor made the basis of a recommendation. The board considered nine provisions of the order, recommended changes in five instances. No mention of section (9) (a) was made. After receipt by the commission of the wage board report public hearings were had in both San Francisco and Los Angeles. In the notice of the hearing no suggestion was made that any change in section (9) as to pay for uniforms was contemplated. For the convenience of the public a summary of the proposed changes recommended by all the wage boards was prepared by the commission's staff and distributed at the hearings. No mention of any change in section (9) as to pay for uniforms was made. The public hearings did not concern themselves specially with section (9). The only mention of pay for uniforms was that by a representative of the Culinary and Hotel Service Employers Union, who was there in connection with the recommendation of a wage board other than that of the Transportation Industries, and who was concerned only with uniforms used by culinary workers and hotel employees, to the effect that the uniforms mentioned in section (9) should be more specifically named and provided at the cost of the employer. This suggestion was given no consideration.

Following the hearing the commission enacted and promulgated section (9) (a) as well as other sections.

While the commission made no specific finding that the minimum wage then prescribed was inadequate or that any condition of labor was prejudicial to the welfare of the women employees, it would appear that such a specific finding is not necessary, as such finding is implied from the action taken by the administrative body. (See *City & County of San Francisco* v. *Superior Court* (1959) 53 Cal.2d 236, 251 [1 Cal.

Rptr. 158, 347 P.2d 294] ; *Bailey* v. *County of Los Angeles* (1956) 46 Cal. 2d 132, 136 [293 P.2d 449] ; *Swars* v. *Council of City of Vallejo* (1949) 33 Cal.2d 867, 872 [206 P.2d 355].) The inference that the action is supported is drawn from the action taken, even though it be a situation in which more than one finding is possible. Hence, under this rule, the number of alternative findings possible is not important once an unambiguous action is taken. Section 1178 does not specifically require written findings of fact, in order to start the procedure of referring the matter to the wage board. Section 1182 which provides for the fixing by the commission of wages, hours and standard conditions of labor, after the wage board conference and the public hearing, likewise does not specifically require such findings.

(2) and (3) *Section (9) not considered either by the wage board or at the public hearings.*

This is a serious defect in the whole procedure, particularly in view of what, from the face of sections 1178, 1182 and 1184 appears to be the legislative policy.

The procedure provides that when the commission finds that wages, hours or conditions of labor require that rules be made concerning them, *or that any rules made theretofore need reconsidering* (§ 1184), the commission shall select a wage board comprised of an equal number of employers and employees engaged in the particular industry affected, plus a representative of the commission, which board shall make recommendations to the commission concerning the matters to be considered. The commission may not proceed until after it has received the report from the wage board. Then, a public hearing must be held (two hearings, if the industry is statewide). ▉ It is only ''[a]fter the wage board conference and public hearing'' (§ 1182) plus the advice at the public hearing of those interested, that the commission may proceed to establish the regulations. It clearly appears, therefore, that the Legislature intended that the commission should not make or change rules until it has had the advice of those skilled in the particular industry and who would know from actual experience the need for and the effect of any particular regulation.

▉ The commission is correct in its statements that it is the commission which writes the order and that the commission may completely disregard the recommendations of the

wage board, as its recommendations are merely advisory. However, the commission may act only after following the procedure provided by the Labor Code. Section 1178 provides: "If after investigation the commission finds that . . . conditions of labor are prejudicial to the health, morals, or welfare of the employee, *the commission shall select a wage board to consider any of such matters. . . . The wage board shall report and make recommendations to the commission . . . . Before promulgating an order* relating to . . . conditions of labor . . . *and after receipt of the report from the wage board,* the commission shall hold a public hearing. . . ." (Emphasis added.).

Section 1181 provides for notices of hearing by the commission "for the purpose of considering and acting upon any matters referred to in Sections 1176 and 1180, inclusive," notice to be mailed to each association of employers and those requesting notice. "Failure to mail such notice shall not invalidate any order of the commission issued after such hearing." (§ 1181.)

Section 1182 provides: *"After the wage board conference and public hearing* . . . the commission may, upon its own motion or upon petition, fix: . . . (c) The standard conditions of labor" etc. (Emphasis added.) Section 1183 provides that a copy of the order shall be mailed to each employer. Section 1184 provides: "After an order has been promulgated . . . the commission may at any time upon its own motion, or upon petition of employers or employees reconsider such order for the purpose of altering, amending, or rescinding such order or any portion thereof. *For this purpose the commission shall proceed in the same manner as prescribed for an original order. . . ."* (Emphasis added.) Section 1185 provides: *". . . when promulgated in accordance with the provisions of this chapter"* the order shall be valid and operative. (Emphasis added.)

If, as here, the commission may ask the wage board to consider "Reopening of Industrial Welfare Commission Orders for Women and Minors," directing special attention only to minimum wages and hours, and then take the position that in any of the large number of matters which could come within the category of wages, hours and conditions of labor (§ 1178) and which were *not* called to the attention of the wage board, the failure of the wage board to consider and recommend

concerning any of the latter could be deemed an adverse recommendation to some rule which the commission later desired to put into effect, such construction of the Labor Code sections would nullify the very purpose of the procedure provided by the Legislature.

The commission states that in the past ''in some instances it made changes in sections of the orders though the particular wage board either recommended no change in those sections or was silent as to those sections.''

How is it possible to get advice from the wage board and the public if no indication is given to either that a change in a particular rule is contemplated? The commission contends that because the wage board could have considered the rule as to uniforms, it must be held that its failure to make any mention of uniforms was a recommendation that no change in the rule be made, and that, as the commission is not bound by the wage board's recommendations, the commission now was free to disregard such inferred recommendation. The contention that a failure to act upon a matter not clearly submitted constitutes a recommendation on the subject is completely unrealistic, and ignores the legislative policy of requiring that the commission be advised by the employers and employees of the industry concerned from their peculiar knowledge of that industry.

An examination of the commission's minutes prior to the submission to the wage board as well as the ''Brochure for Wage Board Members'' given to the board's members definitely shows that a change in the rules as to uniforms was not contemplated by the commission or considered by the wage board, the public or the industry. There was nothing before the wage board or at the public hearing which gave the slightest notice that any change in this respect in section (9) (a) was contemplated.

On February 15, 1957, the commission published ''Summary of Changes in Existing Industrial Welfare Commission Orders Under Consideration by the Commission.'' After setting forth the recommendations of all the wage boards (none of which dealt with payment for uniforms) the summary contained a section ''Other Recommendations Under Consideration by the Commission.'' This contained a recommendation that section (9) (a) provide that the employer may not require as a part of the uniform items contrary to reasonable comfort

and good health, and that protective garments of certain types of process be supplied by the employer. Still no suggestion of any other change in section (9) (a). This apparently was the summary of recommendations presented at the public hearings which were held thereafter. The requirement of public hearings was not necessarily, as contended by the commission, to support by evidence changes in the rules, but for the purpose of giving interested parties an opportunity to be heard on proposed changes so that the commission might be fully advised as to the effect on the particular industry of such changes. Undoubtedly, the wage board, the airlines industry, the other transportation industries and the public considered that nothing concerning employees' uniforms was before the commission for consideration.

 Section 9(a) applies alike to all transportation industries employing women. The airlines segment of that industry contends that its problems concerning women employees' uniforms is different from those of other segments of the industry and particularly from those of other occupations, trades or industries. It undoubtedly was the intention of the Legislature that before the commission could act in matters of the kind involved here, a particular industry should have the right to explain to the wage board and the commission, among other matters, whether its problems are or are not the same as in other occupations. This right was denied by the procedure the commission took in this matter.

Section 1188 provides for a "rehearing in respect to any matters determined or covered" in any final rule or regulation of the commission. It is conceded that application for such rehearing is not a prerequisite to the review by the courts provided for in section 1190. Moreover, there was no hearing on this matter, so that there could be no "rehearing." Members of the industry were entitled to have the subject matter submitted to the wage board for recommendation. This would not be possible on a petition under section 1188. The Attorney General apparently recognizes that the Legislature contemplated that a public hearing is required upon the specific rule change to be made, for in his opening brief he states that had plaintiff applied for a "rehearing" "Plaintiff would then have had the specific language of the order to object to *and, presumably, there would have been a public hearing on that language of the amended order.*" (Emphasis added.) The hearing contemplated by section 1188 is one as

to which only the person applying for a rehearing receives notice.

In view of our decision, we deem it unnecessary to consider other questions raised in the case.

The judgment is affirmed.

Sullivan, J., and Molinari, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied March 13, 1963. Tobriner, J., was of the opinion that the petition should be granted.