**John YODER**

v.

**WESTERN EXPRESS, INC. et al.**

**Case No. EDCV 14-2273 JGB (SPx)**

United States District Court, C.D. California.

Signed October 26, 2015

Attorney(s) Present for Plaintiff(s): Kathy A. Le, Jennifer L. Connor

Attorney(s) Present for Defendant(s): R. Douglas Hanson, Richard D. Marca

### Order DENYING Defendant's Motion for Summary Judgment (Doc. No. 35) (HEARING HELD)

JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

Before the Court is Defendant Western Express, Inc.'s motion for summary judgment. (Doc. No. 35.) After considering the papers filed in support of and in opposition to the motion, as well as the arguments presented at the October 26, 2015 hearing, the Court DENIES Defendant's motion.

## I. BACKGROUND

On September 30, 2014, Plaintiff John Yoder ("Plaintiff" or "Yoder") filed this putative class action complaint in San Bernardino County Superior Court on behalf of himself and others similarly situated against Defendants Western Express, Inc. ("Defendant" or "Western"), Western Express Transport of California, Inc.[1], and fictitious Defendants 1 through 10. ("Complaint," Doc. No. 3, Ex. 1.) On November 5, 2014, Defendant removed the action to this Court. ("Notice of Removal," Doc. No. 1.)

The Complaint alleges 19 causes of action for California wage and hour violations stemming from Yoder's employment as a commercial motor vehicle driver for Western: (1) failure to pay minimum wages for all hours worked; (2) failure to provide meal periods; (3) failure to provide rest periods; (4) failure to timely pay final wages; (5) failure to provide accurate wage statements; (6) failure to pay wages using compliant non-cash instruments; (7) unlawful payroll deductions; (8) failure to reimburse business expenses; (9) failure to provide employment-related documents; (10) violation of California's Unfair Competition Law ("UCL"); and nine representative action claims under California's Private Attorney General Act ("PAGA") for the same alleged wage and hour violations. (Complaint at 1-2.)

---

1. Western does business in California as "Western Express Transport of California, Inc." (Notice of Removal at 3.) Western Express Transport of California, Inc. is not a separate corporation, but is a fictitious name under which Western operates in California. (Id. at 3-4.) Accordingly, the Court will treat Western as the sole named Defendant in this action.

On August 16, 2015, Defendant filed a motion for summary judgment as to all claims alleged by Plaintiff. (Doc. No. 35.) In support of its motion, Defendant filed the following documents:

● Statement of Undisputed Facts and Conclusions of Law, ("SUF," Doc. No. 35-1);

● Memorandum of Points and Authorities, ("Motion," Doc. No. 35-2);

● Declaration of Clarence Easterday, attached to which are Exhibits A through F, ("Easterday Decl.," Doc. No. 35-4); and

● Declaration of Douglas Hanson, attached to which are excerpts from the deposition of John Yoder taken June 1, 2015, ("Yoder Dep.," Doc. No. 35-5).

Plaintiff opposed Defendant's motion on September 4, 2015, ("Opposition," Doc. No. 39), and filed the following supporting documents:[2]

● Request for Judicial Notice,[3] (Doc. No. 39-1);

● Declaration of Jennifer L. Connor, attached to which are Exhibits 1 through 3, (Doc. No. 41); and

● Statement of Genuine Disputes of Material Fact and Statement of Undisputed Facts ("PSUF"), (Doc. No. 39-3).

Defendant filed its reply memorandum on September 14, 2015, ("Reply," Doc. No. 43), along with the following documents:

● Declaration of R. Douglas Hanson, (Doc. No. 43-1);

● Exhibit A to the Hanson Declaration: excerpts and exhibits from the deposi-

tion of Clarence Easterday, ("Easterday Dep." Doc. No. 43-2); and

● Exhibit B to the Hanson Declaration: excerpts of Plaintiff's "position history" from his employment with Western; (Doc. No. 43-3).

The Court held a hearing on October 26, 2015. Counsel for both parties appeared.

## II. LEGAL STANDARD

■ A motion for summary judgment shall be granted when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party must show that "under the governing law, there can be but one reasonable conclusion as to the verdict." Anderson, 477 U.S. at 250, 106 S.Ct. 2505.

■ Generally, the burden is on the moving party to demonstrate its entitlement to summary judgment. Margolis v. Ryan, 140 F.3d 850, 852 (9th Cir.1998); Retail Clerks Union Local 648 v. Hub Pharmacy, Inc., 707 F.2d 1030, 1033 (9th Cir.1983). The moving party bears the initial burden of identifying the elements of the claim or defense and presenting evidence that it believes demonstrates the absence of an issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When the non-moving party has the burden at trial, however, the moving party need not produce evidence negating or disproving every essential element of the non-moving party's case. Id. at 325, 106 S.Ct. 2548. Instead, the moving party's burden is met

---

2. Plaintiff is sternly reminded to adhere to this Court's standing order and submit chambers copies of every document filed. (See Standing Order, Doc. No. 10 ¶ 5.)

3. The Court declines to take judicial notice of any documents for purposes of this motion.

by pointing out an absence of evidence supporting the non-moving party's case. Id. The burden then shifts to the non-moving party to show that there is a genuine issue of material fact that must be resolved at trial. Fed. R. Civ. P. 56(e); Celotex, 477 U.S. at 324, 106 S.Ct. 2548; Anderson, 477 U.S. at 256, 106 S.Ct. 2505. The non-moving party must make an affirmative showing on all matters placed in issue by the motion as to which it has the burden of proof at trial. Celotex, 477 U.S. at 322, 106 S.Ct. 2548; Anderson, 477 U.S. at 252, 106 S.Ct. 2505; see also William W. Schwarzer, A. Wallace Tashima & James M. Wagstaffe, Federal Civil Procedure Before Trial, 14:144. "This burden is not a light one. The non-moving party must show more than the mere existence of a scintilla of evidence." In re Oracle Corp. Sec. Litig., 627 F.3d 376, 387 (9th Cir.2010) (citing Anderson, 477 U.S. at 252, 106 S.Ct. 2505). "The non-moving party must do more than show there is some 'metaphysical doubt' as to the material facts at issue." Id. at 387 (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

■ A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson, 477 U.S. at 248, 106 S.Ct. 2505. In ruling on a motion for summary judgment, the Court construes the evidence in the light most favorable to the non-moving party. Barlow v. Ground, 943 F.2d 1132, 1135 (9th Cir.1991); T.W. Elec. Serv. Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630–31 (9th Cir.1987).

## III. DISCUSSION

Defendant moves for summary judgment as to all nineteen of Plaintiff's causes of action on the grounds that Yoder is not a "wage earner" as that term is defined under California law because he spent approximately 91.5% of his time working outside of California. (Motion at 1.) Western also contends that the application of the California Labor Code or Industrial Welfare Commission ("IWC") Wage Orders to Plaintiff would violate the dormant Commerce Clause. (Id.) Plaintiff does not oppose Defendant's argument that California law should not apply to work performed by Plaintiff outside of California. (Opposition at 1.) Rather, Plaintiff argues California law should apply to the work he performed within the state, and Defendant's motion should be denied on that ground. (Id.) Plaintiff also requests the Court to remand the case back to state court because Western cannot establish by a preponderance of the evidence that the amount in controversy exceeds $5 million.[4] (Id. at 11.) The Court first summarizes the facts pertinent to this motion and then addresses the arguments made by each party.

### A. Facts

The following material facts are sufficiently supported by admissible evidence and are uncontroverted. They are "admitted to exist without controversy" for purposes of the Motion for Summary Judgment. L.R. 56-3 (facts not "controverted by declaration or other written evidence" are assumed to exist without controversy); accord Fed. R. Civ. P. 56(e)(2) (stating that where a party fails to address another party's assertion of fact properly, the court

4. As stated at the hearing, the Court will entertain a properly noticed motion to remand the case to state court should Plaintiff choose to file one. It is not proper to seek remand in the context of an opposition to a motion for summary judgment. See Local Rule 6-1. As such, the Court declines to consider the issue at this time.

may "consider the fact undisputed for purposes of the motion").

Western is a commercial motor carrier incorporated under the laws of Tennessee with its principal place of business in Nashville, Tennessee. (SUF ¶¶ 1-3.) The company employs approximately 2,350 over-the-road truck drivers who haul freight for customers throughout the United States. (Id. ¶¶ 3-5.) Compensation for Western's drivers includes a mileage-based component wherein drivers are paid per mile they drive. (Id. ¶.5; Yoder Dep. at 145.)

Western's "home office," corporate headquarters, and administrative offices are all located in Nashville. (SUF ¶ 6.) Recruiting is also performed out of Nashville, including the review of applications submitted to Western through its online portal. (Id. ¶¶ 7, 11.) Background checks are coordinated and facilitated out of Nashville, and employment decisions are made there. (Id. ¶¶ 8, 9.) Finally, Western's payroll department, which handles payroll for all of the company's truck drivers, is also in Nashville. (Id. ¶ 10.)

Plaintiff, a California resident, initially posted his resume to a website, which prompted a Nashville-based Western recruiter to contact Plaintiff and invite him to apply to work as an over-the-road truck driver for Western. (Id. ¶¶ 11, 12; Yoder Dep. at 215; PSUF ¶ 1.) On July 4, 2012, Plaintiff traveled to Nashville to attend an orientation and submit to pre-employment screening, which included a background check, a toxicology test, and a physical. (SUF ¶¶ 13, 14.) Western hired Plaintiff at that orientation, and subsequently trained Plaintiff for several weeks in Nashville. (Yoder Dep. at 305, 402.) After his training, Plaintiff was dispatched from Nashville. (SUF ¶ 17; Easterday Decl. ¶ 14.)

Western employed Plaintiff as an over-the-road truck driver from July 4, 2012 to January 28, 2014. (Yoder Dep. at 402; SUF ¶ 30.). During Plaintiff's employment with Western, his driver managers were in Nashville. (Yoder Dep. at 305.) However, he received his paychecks in California and paid California taxes as a California resident. (PSUF ¶¶ 1-3.) Approximately 8.5% of the mileage Plaintiff logged while driving for Western was logged within the State of California. (SUF ¶ 19.) The remaining 91.5% of the miles Plaintiff logged were outside of California. (Id.)

### B. FAAAA Preemption

Although not raised by the parties, the Court cannot apply California wage and hour laws to motor carriers unless it first finds that the state laws are not preempted by the Federal Aviation Administration Authorization Act of 1994 ("FAAAA"). See Dilts v. Penske Logistics, LLC, 769 F.3d 637, 642 (9th Cir.2014); Californians For Safe & Competitive Dump Truck Transp. v. Mendonca, ("Mendonca"), 152 F.3d 1184, 1187 (9th Cir.1998).

Section 14501 of the FAAAA preempts a wide range of state regulation of intrastate motor carriage. It provides:

> (c) Motor carriers of property. (1) General Rule. Except as provided in paragraphs (2) and (3), a State, political subdivision of a State, or political authority of 2 or more States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier ... with respect to the transportation of property.

49 U.S.C. § 14501(c)(1) (1997) (emphasis added). Paragraphs (2) and (3) exempt a number of types of state regulations and controls. See 49 U.S.C. § 14501(c)(2), (3). However, none of those exemptions apply here. "Beyond this, the text offers little else in the way of definition or direction as

to the FAAA Act's preemptive scope." Mendonca, 152 F.3d at 1187.

The preemption doctrine is rooted in the Supremacy Clause of the U.S. Constitution. U.S. Const., art. VI, cl. 2. "[T]he purpose of Congress is the ultimate touchstone in every preemption case." Medtronic, Inc. v. Lohr, 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996). "Preemption analysis begins with the presumption that Congress does not intend to supplant state law. Although Congress clearly intended FAAAA to preempt some state regulations of motor carriers who transport property, the scope of the preemption must be tempered by the presumption against the preemption of state police power regulations." Tillison v. Gregoire, 424 F.3d 1093, 1098 (9th Cir. 2005) citing N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 654, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995) and Medtronic, Inc. v. Lohr, 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996). "Wage and hour laws constitute areas of traditional state regulation, although that fact alone does not immunize state employment laws from preemption if Congress in fact contemplated their preemption." Dilts, 769 F.3d at 643.

The Supreme Court has identified four principles of FAAAA preemption: "(1) state enforcement actions having a connection with, or reference to, carrier rates, routes, or services' are pre-empted; (2) such pre-emption may occur even if a state law's effect on rates, routes, or services 'is only indirect;' (3) with respect to pre-emption, it makes no difference whether a state law is 'consistent' or 'inconsistent' with federal regulation; and (4) pre-emption occurs at least where state laws have a 'significant impact' related to Congress' deregulatory and pre-emption-related objectives." Rowe v. New Hampshire Motor Transp. Ass'n, 552 U.S. 364, 370–71, 128 S.Ct. 989, 169 L.Ed.2d 933 (2008) (internal quotations and citations omitted). The principal purpose of the FAAAA is "to prevent States from undermining federal deregulation of interstate trucking" through a "patchwork" of state regulations. Dilts, 769 F.3d at 644. However, the Supreme Court also noted that federal law might not preempt state laws which affect fares in only a "tenuous, remote, or peripheral manner." Id.

In applying the FAAAA preemption doctrine, the Ninth Circuit has found that "in a certain sense," California's wage laws "relate to" motor carriers' "prices, routes, or services" because higher wages are incorporated into a motor carrier's business model. Mendonca, 152 F.3d at 1189. However, the court held "that the effect is no more than indirect, remote, and tenuous," and that the wage laws do not "frustrate[ ] the purpose of deregulation by acutely interfering with the forces of competition." Id. (emphasis in original).

In Dilts, the Ninth Circuit augmented its interpretation of FAAAA preemption by finding that "generally applicable background regulations that are several steps removed from prices, routes, or services, such as prevailing wage laws or safety regulations, are not preempted, even if employers must factor those provisions into their decisions about the prices that they set, the routes that they use, or the services that they provide. Such laws are not preempted even if they raise the overall cost of doing business or require a carrier to redirect or reroute some equipment." Dilts, 769 F.3d at 646.

Applying this reasoning, Dilts found such not-preempted "generally applicable background regulations" include California's meal and rest period provisions. Id. at 647–648. The court in Dilts echoed the reasoning in Mendonca in stat-

ing that "while motor carriers may have to take into account the meal and rest break requirements when allocating resources and scheduling routes—just as they must take into account state wages laws, Mendonca, 152 F.3d at 1189, or speed limits and weight restrictions, 49 U.S.C. § 14501(c)(2)—the laws do not 'bind' motor carriers to specific prices, routes, or services." Dilts, 769 F.3d at 647. "Nor do they 'freeze into place' prices, routes, or services or 'determine (to a significant degree) the prices, routes, or services that motor carriers will provide." Id. citing Rowe, 552 U.S. at 372, 128 S.Ct. 989. The court continued:

> Further, applying California's meal and rest break laws to motor carriers would not contribute to an impermissible "patchwork" of state-specific laws, defeating Congress' deregulatory objectives. The fact that laws may differ from state to state is not, on its own, cause for FAAAA preemption. In the preemption provision, Congress was concerned only with those state laws that are significantly "related to" prices, routes, or services. A state law governing hours is, for the foregoing reasons, not "related to" prices, routes, or services and therefore

does not contribute to "a patchwork of state service-determining laws, rules, and regulations." Rowe, 552 U.S. at 373, 128 S.Ct. 989 (emphasis added). It is instead more analogous to a state wage law, which may differ from the wage law adopted in neighboring states but nevertheless is permissible. Mendonca, 152 F.3d at 1189.

769 F.3d at 647–48. Here, Plaintiff alleges violations of numerous California wage and hour laws and regulations against Western.[5] These state laws can be categorized as follows: (1) laws regulating the minimum wages employers must pay their employees;[6] (2) rest and meal break regulations;[7] (3) laws regulating the manner in which employers must pay their employees, including the timing of payment, the form of payment, and the requirement to keep accurate employment records;[8] (4) reimbursement for business expenses and rules regarding deductions;[9] and (5) penalties for failing to adhere to state wage and hour laws.[10]

The Court finds that none of these categories of California wage and hour laws is preempted by the FAAAA. Under Mendonca, California minimum wages laws are

---

**5.** Labor Code sections 201, 202, 203, 212, 221, 223, 224, 226, 226.6, 226.7, 450, 512, 558, 1174, 1174.5, 1175, 1194, 1194.2, 1197, 1198.5, 2800, and 2802; and IWC Wage Order 9 paragraphs 4, 7, 11, and 12, Cal. Code Regs. tit. 8, § 11140. (See Complaint, claims one through nine.)

**6.** Labor Code sections 223 ("payment of less than statutory or contractual wage scale"); 1194 (minimum wage); 1197 (same); and IWC Order No. 9 ¶ 4 (minimum wages); ¶ 7 ("Reporting Time Pay").

**7.** Labor Code section 512 (meal periods); IWC Order No. 9 §§ 11, 12 (meal and rest periods).

**8.** Labor code sections 212 ("Form of Payment"), 201-203 (payment of wages to an employee upon discharge or termination);

226 ("Itemized Statements"); 450 ("employer shall not coerce employee to purchase anything of value," i.e. a debit card used to redeem wages); 1194 (employer's duty to maintain records); and 1198.5 (employee's right to inspect personnel records).

**9.** Labor Code sections 221 ("Repayment of Wages to Employer"); 224 ("Authorized Deductions"); 2800 ("employer shall indemnify employee for losses caused by employer's want of ordinary care"); 2802 (indemnification for employee's "expenses and losses in discharging duties").

**10.** Labor Code sections 226.6, 226.7, 558, 1174.5, and 1175 (all penalties).

not preempted. See 152 F.3d at 1189 (finding the effect on motor carriers' "prices, routes, or services" is "no more than indirect, remote, and tenuous"). Similarly, pursuant to Dilts, California's meal and rest break provisions are not preempted.[11] See 769 F.3d at 647. For the same reasons, the remaining California wage and hour laws do not directly affect Western's "prices, routes, or services." Laws regulating the manner in which employers must pay their employees or requiring employers to reimburse employees for business expenses are exactly the type of "generally applicable background regulations that are several steps removed from prices, routes, or services." See Dilts, 769 F.3d at 646. These "normal background rules" apply to almost all employers doing business in California and "do not set prices, mandate or prohibit certain routes, or tell motor carriers what services they may or may not provide, either directly or indirectly." See id. at 647. Further, these wage laws do not "frustrate[ ] the purpose of deregulation by acutely interfering with the forces of competition." See Mendonca, 152 F.3d at 1189. Accordingly, the Court finds that the wage and hour laws underlying Plaintiff's claims are not preempted by the FAAAA.

## C. Preemption by Federal Hours of Service Regulations

The next issue, also not raised by the parties, is whether California's meal and rest break regulations are preempted by federal Hours of Service ("HOS") Regulations notwithstanding that they are not preempted by the FAAAA.[12] See 49 C.F.R. § 395.3.

State law is "nullified to the extent that it actually conflicts with federal law." Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta, 458 U.S. 141, 153, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982). "Such a conflict arises when compliance with both federal and state regulations is a physical impossibility or when state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Id.; see also Wyeth v. Levine, 555 U.S. 555, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009). Along with Congress, "a federal agency acting within the scope of its congressionally delegated authority may preempt state regulation." City of N.Y. v. FCC, 486 U.S. 57, 63–64, 108 S.Ct. 1637, 100 L.Ed.2d 48 (1988). Thus, when "Congress has entrusted an agency with the task of promulgating regulations to carry out the purposes of a statute, ... as part of the pre-emption analysis we must consider whether the regulations evidence a desire to occupy a field completely." R.J. Reynolds Tobacco Co. v. Durham County, N.C., 479 U.S. 130, 149, 107 S.Ct. 499, 93 L.Ed.2d 449 (1986).

"Pre-emption should not be inferred ... simply because the agency's regulations are comprehensive." R.J. Reynolds Tobacco Co., 479 U.S. at 149, 107

---

11. Although Dilts dealt specifically with a motor carrier who operated entirely within the State of California, this Court finds its reasoning applies to this case with equal force. This is especially true because the court in Dilts refused to limit its holding to the circumstances before it. See 769 F.3d at 648, fn. 2 (choosing not to decide whether a federal law can preempt state laws on an "as applied" basis because "California's meal and rest break laws, as generally applied to motor carriers, are not preempted").

12. The Ninth Circuit in Dilts did not have occasion to address this because the motor carriers in that case were not regulated by the HOS Regulations. See 769 F.3d at 648, fn. 2 ("Plaintiff drivers work on short-haul routes and work exclusively within the state of California. They therefore are not covered by other state laws or federal hours-of-service regulations, 49 C.F.R. § 395.3").

S.Ct. 499. Federal regulations have "to be sufficiently comprehensive to authorize and govern programs in States which [have] no requirements of their own as well as cooperatively in States with such requirements." Hillsborough County, Fla. v. Automated Med. Labs., Inc., 471 U.S. 707, 717, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985). As the Supreme Court stated, "merely because the federal provisions were sufficiently comprehensive to meet the need identified by Congress did not mean that States and localities were barred from identifying additional needs or imposing further requirements in the field." Id.

The federal regulation at issue in this case is 49 C.F.R. § 395.3:

(a) Except as otherwise provided in § 395.1, no motor carrier shall permit or require any driver used by it to drive a property-carrying commercial motor vehicle, nor shall any such driver drive a property-carrying commercial motor vehicle, regardless of the number of motor carriers using the driver's services, unless the driver complies with the following requirements:

(1) Start of work shift. A driver may not drive without first taking 10 consecutive hours off duty;

(2) 14–hour period. A driver may drive only during a period of 14 consecutive hours after coming on duty following 10 consecutive hours off duty. The driver may not drive after the end of the 14–consecutive-hour period without first taking 10 consecutive hours off duty.

(3) Driving time and rest breaks.

(i) Driving time. A driver may drive a total of 11 hours during the 14–hour period specified in paragraph (a)(2) of this section.

(ii) Rest breaks. Except for drivers who qualify for either of the short-haul exceptions in § 395.1(e)(1) or (2),

driving is not permitted if more than 8 hours have passed since the end of the driver's last off-duty or sleeper-berth period of at least 30 minutes.

49 C.F.R. § 395.3(a).

The potentially-conflicting California state law provisions are California Labor Code section 512 and IWC Wage Order No. 9, paragraphs 11 and 12. Section 512 states in pertinent part:

(a) An employer may not employ an employee for a work period of more than five hours per day without providing the employee with a meal period of not less than 30 minutes, except that if the total work period per day of the employee is no more than six hours, the meal period may be waived by mutual consent of both the employer and employee. An employer may not employ an employee for a work period of more than 10 hours per day without providing the employee with a second meal period of not less than 30 minutes, except that if the total hours worked is no more than 12 hours, the second meal period may be waived by mutual consent of the employer and the employee only if the first meal period was not waived.

Cal. Lab. Code § 512. IWC Order No. 9 states in pertinent part:

¶ 11. Meal Periods: Every employer shall authorize and permit all employees after a work period of not more than five (5) hours to take a meal period of not less than thirty (30) minutes, except that when a work period of not more than six (6) hours will complete the day's work, the meal period may be waived by mutual consent of employer and employee. Unless the employee is relieved of all duty during a thirty (30) minute meal period, the meal period shall be considered an "on duty" meal period and counted as time worked. An "on duty"

meal period shall be permitted only when the nature of the work prevents an employee from being relieved of all duty and when by written agreement between the parties an on-the-job paid meal period is agreed to.

¶ 12. Rest Periods: Every employer shall authorize and permit all employees to take rest periods, which insofar as practicable shall be in the middle of each work period. The authorized rest period time shall be based on the total hours worked daily at the rate of ten (10) minutes net rest time per four (4) hours or major fraction thereof. However, a rest period need not be authorized for employees whose total daily work time is less than three and one-half (3 1/2) hours. Authorized rest period time shall be counted, as hours worked for which there shall be no deduction from wages.

Cal. Code Regs. tit. 8, § 11140 at ¶¶ 11, 12.

 First, the Court finds there is no direct "conflict" between the HOS Regulations and the California meal and rest break laws. See de la Cuesta, 458 U.S. at 153, 102 S.Ct. 3014 (finding that "a conflict arises when compliance with both federal and state regulations is a physical impossibility or when state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress"). The HOS Regulations permit drivers to "drive only during a period of 14 consecutive hours after coming on duty following 10 consecutive hours off duty." 49 C.F.R. § 395.3(a)(2). California regulations require drivers to take two thirty minute rest periods and three ten minute rest breaks in that period, for a total possible drive time of 12.5 hours. Cal. Code Regs. tit. 8, § 11140 at ¶¶ 11, 12. This does not conflict with the HOS Regulations, because they state a "driver may drive a

total of 11 hours during the 14–hour period" and may not drive more than 8 hours with at least a 30-minute rest break. 49 C.R.R. § 395.3(a)(3); see also Hillsborough County, Fla., 471 U.S. at 717, 105 S.Ct. 2371 ("merely because the federal provisions were sufficiently comprehensive to meet the need identified by Congress did not mean that States and localities were barred from identifying additional needs or imposing further requirements in the field"). Accordingly, the Court finds that the California state law provisions are not preempted by the HOS Regulations. Accord Villalpando v. Exel Direct Inc., No. 12–CV–04137–JCS, 2015 WL 5179486, at *34–36 (N.D.Cal. Sept. 3, 2015) (rejecting a trucking company's argument that California's meal and rest break laws are preempted by the HOS Regulations).

Second, the Court also finds persuasive that the federal agency responsible for national motor carrier regulations, the Federal Motor Carrier Safety Administration ("FMCSA"),[13] does not believe the HOS Regulations preempt California rest and meal break laws. The FMCSA has statutory authority pursuant to 49 U.S.C. § 31141 to preempt state laws that affect "commercial motor vehicle safety." On July 3, 2008, a group of motor carriers petitioned the FMCSA, requesting that it preempt California rest and meal break laws:

> Applying the Meal and Rest Break Rules to drivers subject to the HOS Regulations imposes limitations on a driver's time that are different from and more stringent than the HOS Regulations because the Meal and Rest Break Rules limit the amount of hours available to a driver to complete driving duties after initially coming on-duty to

---

**13.** The FMCSA is an administration of the Department of Transportation empowered to

regulate interstate commercial motor carriers. See 49 U.S.C. § 113,

less than the 14 hours permitted by the HOS Regulations. Moreover, the Meal and Rest Break Rules do not allow for the flexibility provided by the HOS Regulations, further exacerbating the effect of the limitations imposed by the Meal and Rest Break Rules. This lack of flexibility not only hinders operations from a scheduling standpoint, it also creates serious safety concerns. Specifically, by imposing meal and rest breaks at set times, the Meal and Rest Break Rules limit a driver's ability to take breaks when they are actually needed. A driver subject only to the HOS Regulations, on the other hand, is not subject to externally imposed limitations and is instead able to take breaks when he or she deems necessary.

See Notice of Rejection of Petition for Preemption: "Meal Breaks and Rest Breaks for Commercial Motor Vehicle Drivers," 73 FR 79204–01 (FMSCA, Dec. 24, 2008). However, the FMCSA rejected the petition, reasoning that "[t]he California meal break statute [Cal. Labor Code § 512] and the corresponding rules in § 11090(11)-(12) are not regulations 'on commercial motor vehicle safety' and thus do not meet the threshold requirement for consideration under 49 U.S.C. 31141." Id. The FMSCA also noted that Federal Motor Carrier Safety Regulations ("FMCSR") "have for decades required carriers and drivers to comply with all of the laws, ordinances, and regulations of the jurisdiction where they operate." Id. FMCSR § 392.2 states:

> Every commercial motor vehicle must be operated in accordance with the laws, ordinances, and regulations of the jurisdiction in which it is being operated. However, if a regulation of the Federal Motor Carrier Safety Administration imposes a higher standard of care than that law, ordinance or regulation, the Federal Motor Carrier Safety Adminis-

tration regulation must be complied with.

Although not bound by the reasoning of the FMSCA, the Court finds it persuasive. See Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944) (holding that a non-controlling agency opinion may carry persuasive weight, depending on the "thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade"). The FMCSA has general expertise in the field of transportation and regulation; the position taken in the rejection of the petition represents reasoned consideration of the question; and the FMCSA's position is consistent with the agency's subsequent pronouncement in an amicus brief submitted to the Ninth Circuit advocating that the California meal and rest break provisions are not preempted. See Dilts, 769 F.3d at 650.

For the foregoing reasons, the Court finds that California's meal and rest break provisions do not conflict with the HOS Regulations and are therefore not preempted.

### D. Commerce Clause

The Court now turns to Western's argument that application of California's wage and hour laws to the interstate trucking industry would violate the Commerce Clause of the Constitution. (Motion at 16-19.)

The Commerce Clause empowers Congress "[t]o regulate Commerce ... among the several States." U.S. Const., Art. I, § 8, cl. 3. Although the Commerce Clause does not expressly restrain "the several States," the Supreme Court has "sensed a negative implication in the provision since the early days." Dep't of Reve-

nue of Ky. v. Davis, 553 U.S. 328, 338, 128 S.Ct. 1801, 170 L.Ed.2d 685 (2008). This negative implication known as the dormant Commerce Clause "prevents a State from jeopardizing the welfare of the Nation as a whole by placing burdens on the flow of commerce across its borders that commerce wholly within those borders would not bear." American Trucking Ass'ns, Inc. v. Michigan Public Serv. Comm'n et al., 545 U.S. 429, 433, 125 S.Ct. 2419, 162 L.Ed.2d 407 (2005) (citations omitted).

 In analyzing whether a state's regulatory measures violate the dormant Commerce Clause, the first inquiry is whether a challenged law facially discriminates against interstate commerce. See Oregon Waste Systems, Inc. v. Department of Environmental Quality of Ore., 511 U.S. 93, 99, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994). A discriminatory law is "virtually per se invalid," and will survive only if it "advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." Id. at 101, 114 S.Ct. 1345. Absent discrimination, however, the inquiry turns to whether the challenged law "regulates evenhandedly to effectuate a legitimate local public interest and [whether] its effects on interstate commerce are only incidental." Pike v. Bruce Church, Inc., 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970). If so, the law "will be upheld unless the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits." Id.

There is no allegation here that California's wage and hour laws facially discriminate against interstate commerce. Rather, the only argument is that the laws impose a burden on interstate commerce that is impermissible under Pike. State laws frequently survive Pike scrutiny. See, e.g., United Haulers Assn., Inc. v. Oneida–Herkimer Solid Waste Management Authority,

550 U.S. 330, 346–47, 127 S.Ct. 1786, 167 L.Ed.2d 655 (2007) (finding it unnecessary to decide whether ordinances related to waste management "impose any incidental burden on interstate commerce because any arguable burden does not exceed the public benefits of the ordinances"); Northwest Central Pipeline Corp. v. State Corporation Comm'n of Kan., 489 U.S. 493, 525–26, 109 S.Ct. 1262, 103 L.Ed.2d 509 (1989) (finding a Kansas state regulation regarding production of gas "is an exercise of Kansas' traditional and congressionally recognized power," which, even if it reduced takes from other states, "is not 'clearly excessive' in relation to Kansas' substantial interest in controlling production to prevent waste and protect correlative rights; and the possibility that the regulation may result in the diversion of gas to intrastate purchasers is too impalpable to override the state's weighty interest"); Minnesota v. Clover Leaf Creamery Co., 449 U.S. 456, 472–474, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981) (finding Minnesota's statute mandating dairies package milk in a particular kind of container satisfied legitimate state purposes of resource conservation, easing solid waste disposal problems, and conserving energy, and that any burden on interstate commerce was not "clearly excessive in relation to the putative local benefits"). However, they sometimes fail, as in Pike itself. 397 U.S. at 146, 90 S.Ct. 844.

 Plaintiff is not seeking to impose California's wage and hour laws on time spent by Plaintiff working outside the State of California. Rather, Plaintiff is only seeking redress for alleged violations of California's wage and hour laws for time Plaintiff spent working within the state's borders. Although California has a legitimate public interest in regulating employment practices within its state, see Baumann v. Chase Inv. Servs. Corp., 747 F.3d

1117, 1123 (9th Cir.2014) (recognizing "the public interest in enforcement of California's labor law"), the extent or strength of that interest must be balanced with the burden, if any, that exists on interstate commerce. See Pike, 397 U.S. at 142, 90 S.Ct. 844 ("[T]he extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities"). To be held unconstitutional, such a burden must be "clearly excessive in relation to" the benefits afforded California citizens through the enforcement of California's labor laws. Id.

### 1. Nature of Local Public Interest

 The inquiry into whether an impact on interstate commerce is permissible "necessarily involves a sensitive consideration of the weight and nature of the state regulatory concern in light of the extent of the burden imposed on the course of interstate commerce." Raymond Motor Transp., Inc. v. Rice, 434 U.S. 429, 98 S.Ct. 787, 54 L.Ed.2d 664 (1978). It is a well-recognized principle of federal constitutional law that "[s]tates possess broad authority under their police powers to regulate the employment relationship to protect workers within the State. Child labor laws, minimum wage and other wage laws, laws affecting occupational health and safety, and workmen's compensation laws are only a few examples." De Canas v. Bica, 424 U.S. 351, 96 S.Ct. 933, 47 L.Ed.2d 43 (1976); accord Iskanian v. CLS Transp. Los Angeles, LLC, 59 Cal.4th 348, 388, 173 Cal.Rptr.3d 289, 327 P.3d 129 (2014) ("There is no question that the enactment and enforcement of laws con-cerning wages, hours, and other terms of employment is within the state's historic police power."). Accordingly, the California wage and hour laws at issue in this case—laws affecting pay stubs, minimum wages, meal and rest break periods, and the timing of payments—fall squarely within California's police powers to regulate the employment of its citizens.

However, the California Supreme Court has recognized that the strength of the State's interest in regulating employment may vary depending on the labor law at issue. The court contrasted the strength of the State's interest in laws protecting an employee's right to overtime compensation with its interest in "other technical aspect[s] of California wage law." Sullivan v. Oracle Corp., 51 Cal.4th 1191, 1201, 127 Cal.Rptr.3d 185, 254 P.3d 237 (2011) ("California's interest in the content of an out-of-state business's pay stubs, or the treatment of its employees' vacation time, for example, may or may not be sufficient to justify choosing California law over the conflicting law of the employer's home state"). In finding that California's overtime law applied to all work performed in the state regardless of the residency of the employer or employee, the Court rebuked the defendant-employer's argument "that California's overtime laws might burden interstate commerce more than incidentally, by imposing onerous regulations on businesses that bring or send employees to work temporarily in California." Id. The Court stated this argument "is based in large part on the assumption that, if out-of-state employers must pay overtime under California law, they must also comply with every other technical aspect of California wage law.[14] The assumption, as not-

---

14. The defendant in Sullivan specifically contended that the burden on interstate commerce "might arise not just from the effort and expense of complying with the overtime law, but from complying as well with other provisions of California wage law governing such matters as the contents of pay stubs, meal periods, the compensability of travel

ed, is of doubtful validity." Id. at 1201–1202, 127 Cal.Rptr.3d 185, 254 P.3d 237.

Because California's high court recognized that the strength of California's wage and hour laws may vary depending on the type of conduct regulated, yet declined to opine on precisely which labor laws were of the "technical" variety not to be accorded the same weight as laws regulating overtime compensation, this Court is without guidance to determine the level of strength to afford the laws at issue in this case. Further, neither party has provided this Court with argument or authority as to the relative strength of the different categories of wage and hour laws alleged. In fact, in Western's reply brief, it expressly does not dispute that California has a legitimate local public interest in ensuring wage earners in California are protected under its labor laws generally.[15] (Reply at 6.)

As such, the Court finds that the labor laws alleged here—laws affecting pay stubs, minimum wages, meal and rest break periods, and the timing of payments—should be afforded, at a minimum, significant weight in a Commerce Clause analysis. See Iskanian, 59 Cal.4th at 388, 173 Cal.Rptr.3d 289, 327 P.3d 129 ("There

is no question that the enactment and enforcement of laws concerning wages, hours, and other terms of employment is within the state's historic police power"). California has an indisputably legitimate public interest in enforcing labor laws which protect its workers. See Baumann, 747 F.3d at 1123 (recognizing "the public interest in enforcement of California's labor law"). The Court finds the protection afforded to employees by these laws is a "cognizable benefit for purposes of the Pike test." See United Haulers, 550 U.S. at 346, 127 S.Ct. 1786 (finding that the "local interest" necessary to satisfy the Pike excessive burden test is lower than that required to "justify discrimination against interstate commerce") (emphasis in original). Additionally, the Court finds that California's wage and hour laws regulate "even-handedly" as they apply to almost all employers within the state, not just those engaged in interstate commerce. See Cal. Lab. Code § 200.[16]

The Court now addresses whether, relative to California's legitimate local public interest in enforcing labor laws, the demonstrated burden on interstate commerce is "clearly excessive." See Pike, 397 U.S. at 142, 90 S.Ct. 844.

time, the accrual and forfeiture of vacation time, and the timing of payment to employees who quit or are discharged." 51 Cal.4th at 1200, 127 Cal.Rptr.3d 185, 254 P.3d 237.

**15.** This is somewhat in conflict with Western's Motion, wherein it argues that "California cannot be said to have any significant local interest in the application of its laws to an employee like Yoder who spent approximately 91.5% of his time outside California." (Motion at 18.) However, this claim goes more to Defendant's argument that Yoder is not a California wage earner, which the Court addresses below. For purposes of the Commerce Clause analysis, the Court finds that California has an interest in protecting all employees that work within its borders, regardless of the time spent. See Cal. Lab. Code

§ 1171.5 (declaration by the California Legislature, "[a]ll protections, rights, and remedies available under state law... are available to all individuals... who have applied for employment, or who are or who have been employed, in this state"); see also Sullivan, 51 Cal.4th at 1198, 127 Cal.Rptr.3d 185, 254 P.3d 237.

**16.** The IWC issues wage orders on an industry-by-industry basis. Martinez v. Combs, 49 Cal.4th 35, 57, 109 Cal.Rptr.3d 514, 231 P.3d 259 (2010). The wage orders impose similar meal and rest period requirements for all nonexempt employees in California. See generally Cal. Code Regs., tit. 8, §§ 11010–11170; Brinker Rest. Corp. v. Superior Court, 53 Cal.4th 1004, 1037 fn. 1, 139 Cal.Rptr.3d 315, 273 P.3d 513 (2012).

## 2. Burden on Interstate Commerce

Western makes several arguments in support of its claim that California's wage and hour laws impose clearly excessive burdens on interstate commerce. First, Western argues there is a need for uniformity in the interstate trucking industry— as evidenced by Congress's deregulation of the industry through the FAAAA.[17] Compliance with multiple states' laws on a daily basis, it argues, would hamper its operations. (Reply at 5.) In support of this argument, Western states it would have to track exactly how much time Yoder spends in each state, a practice it currently does not perform because it pays Yoder based on miles driven, not time spent driving. (Id. at 5-6.) If Yoder has been driving for four hours and crosses into California to make a delivery, he would be entitled to take a rest break "the instant he crossed the state line, followed by a meal break an hour later, despite the fact that he has only been actually working in California for one hour." (Id. at 7.) This, Western argues, is an "absurd, unworkable result." (Id.) Further, routes that take Yoder only through California for a three-hour period would not entitle him to either a rest break or a meal break, under California law. (Id.) Second, Western argues compliance with various states' laws would produce anomalous results. (Id.) In support of this claim, Western asserts hypothetically that if two drivers, one a California resident and the other an Arizona resident, each hauled loads from Fontana, California to Kingman, Arizona, their pay would be different simply because one driver is a California resident. (Id.)

However, Western supplies the Court with no analogous legal authority to support its claim that these burdens are "clearly excessive" in relation to the legitimate public interest California has in regulating employment matters. Instead, Western cites to four cases, three of which predate Pike and as such do not apply its standard, and the other is expressly non-citable. (Reply at 5-7.) The two Supreme Court cases cited, both of which are over 60 years old, stand for the proposition that there is a need for uniformity in the regulation of interstate commerce. See Southern Pac. Co. v. Arizona, 325 U.S. 761, 767, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945); California v. Zook, 336 U.S. 725, 728, 69 S.Ct. 841, 93 L.Ed. 1005 (1949). However, such a vague pronouncement is insufficient to adequately support the proposition that California's wage and hour laws somehow impermissibly interfere with federal regulation of interstate commerce. (See supra, re: discussion of federal preemption.)

Western discusses United Air Lines, Inc. v. Industrial Welfare Commission, 211 Cal.App.2d 729, 28 Cal.Rptr. 238 (1963) in detail, and relies on it for the proposition that "compliance with various states' laws produce anomalous results." However, United Air Lines predated Pike and as such did not analyze whether the effect on interstate commerce was "clearly excessive" in relation to a legitimate local public interest. Rather, United Air Lines explicitly stated that the "burden may not be very great." 211 Cal.App.2d at 747, 28 Cal.Rptr. 238. Accordingly, the Court will not consider it.

Lastly, Western relies on an unpublished and expressly non-citable case, Guy v. IASCO, No. B168339, 2004 WL 1354300 (Cal.Ct.App. June 17, 2004). The plaintiffs in Guy were flight engineers for an airline

---

**17.** See Rowe, 552 U.S. at 368, 128 S.Ct. 989 ("In 1980, Congress deregulated trucking. See Motor Carrier Act of 1980, 94 Stat. 793. And a little over a decade later, in 1994, Congress similarly sought to preempt state trucking regulation. See Federal Aviation Administration Authorization Act of 1994, 108 Stat. 1605–1606").

contractor based in California. 2004 WL 1354300, at *2. The flight engineers performed more than 90% of their work outside the state of California on various national and international flights. Id. The plaintiffs filed suit against their employer claiming that under various provisions of California law, they were entitled to, but did not receive overtime pay and that they were not compensated for all the time that they worked. Id. at *1. The California Court of Appeal found that to apply California's IWC Wage Orders to these employees would violate the dormant Commerce Clause because the plaintiffs were seeking to recover overtime pay for time spent working outside the state of California. Id. at *7 ("The regulation of overtime pay of flight personnel who work in interstate and foreign commerce is a direct regulation of such commerce. The United States Supreme Court has made clear that a state statute that directly regulates commerce occurring outside the boundaries of the state violates the Commerce Clause"). As such, Guy in inapposite because Yoder is seeking to apply California wage and hour law only to work he actually performed while in the state.

 The Court is not prepared, on the record before it, to hold that the application of California's wage and hour laws to work performed within the state is a "clearly excessive" burden on interstate commerce relative to the legitimate local public interest California has in regulating employment matters. Western has not provided any evidence of the increase in costs it would incur by complying with California wage and hour laws, nor does it purport to describe why forcing it to keep track of an employee's time spent in his home state is more onerous than the tracking and payment methods already in place for its more than 2,300 drivers nationwide. Western's administrative system is presently able to record and keep track of drivers' various routes at any given time, but Western does not explain why keeping track of a driver's time spent in various states would be more burdensome or how much more burdensome it would be.[18] See Sullivan, 51 Cal.4th at 1201, 127 Cal. Rptr.3d 185, 254 P.3d 237 (finding no burden on interstate commerce where "the asserted burdens on out-of-state business... are entirely conjectural. The... facts contain nothing supporting [the defendant's] assertions.") (emphasis added); see also Opposition at 10 ("Defendant has not even attempted to factually evidence the purported burden on interstate commerce, nor undertaken to segregate out its challenge for any particular Labor Code or Wage Order provision").

Further, Western's payroll system is certainly presently structured to account for each driver's respective state's taxation

---

18. Nor does Western attempt to demonstrate, by market analysis or otherwise, what the burden would be on interstate commerce as a whole. Western may or may not be representative of the trucking industry as a whole, but the Court has no facts before it to determine whether the application of California's wage and hour laws to this one trucking company would excessively burden the entire interstate trucking industry. A singular burden on Western to comply with California's wage and hour laws may be greater than or less than burdens on other interstate trucking companies, but Western failed to provide the Court with any information on that point. See Pike, 397 U.S. at 146, 90 S.Ct. 844 (noting that a state statute which does not impose a "rigid" burden on an entire industry, but just the appellee company, with respect to the allocation of interstate resources, is an "incidental consequence of a regulatory scheme" which "could perhaps be tolerated if a more compelling state interest [than enhancing the reputation of a state's local fruit producers] were involved"). As previously noted, California's interest in protecting its workers is, at a minimum, a significant state interest.

schemes. Western has not demonstrated, nor even argued, that conforming its payroll methods, such as the form and content of its wage statements, to California state law is different or more onerous than the method it currently employs. Accordingly, the Court finds that the record "shows no special circumstance suggesting" that California's wage and hour laws operate "in practice as anything other than an unobjectionable exercise of the State's police power." See American Trucking Associations, 545 U.S. at 434, 125 S.Ct. 2419. The "minimal facts in the record tell us little" about any significant practical burden on interstate commerce. Id. at 435, 125 S.Ct. 2419. Accordingly, the Court does not find, on the record before it, that application of California's wage and hour laws to Plaintiff would violate the dormant Commerce Clause.

### E. California Wage Earner

██ The Court now addresses Defendant's primary argument: that Plaintiff is not a "California wage earner" entitled to the protection of California's wage and hour laws because he spends 91.5% of his work time outside the state of California. (Motion at 9.)

Western principally relies on Tidewater Marine W., Inc. v. Bradshaw, 14 Cal.4th 557, 59 Cal.Rptr.2d 186, 927 P.2d 296 (1996), a California Supreme Court case. The court in Tidewater stated: "If an employee resides in California, receives pay in California, and works exclusively, or principally, in California, then that employee is a 'wage earner of California' and presumptively enjoys the protection of IWC regulations." Id. at 578, 59 Cal. Rptr.2d 186, 927 P.2d 296. Western illogically argues this statement means that if an individual does not work "exclusively, or principally in California," then that individual can never be afforded the protec-

tions under California labor laws. (Reply at 2.) The Court finds this to be a conclusion unsupported by either logic or the legal authority upon which it relies.

Tidewater concerned the application of California wage and hour law to plaintiffs who worked in the Santa Barbara Channel on oil-drilling platforms. 14 Cal.4th at 561, 59 Cal.Rptr.2d 186, 927 P.2d 296. The central dispute in that case was whether the Santa Barbara Channel was within the State of California. Id. The Tidewater court explicitly "express[ed] no opinion as to whether the trial court can enjoin the application of IWC wage orders to crew members who work primarily outside California's state law boundaries." Id. at 579, 59 Cal.Rptr.2d 186, 927 P.2d 296. Indeed, immediately after its pronouncement regarding the presumption afforded to California residents working "exclusively, or principally in California," Tidewater cited to United Air Lines, Inc. v. Industrial Welfare Com., 211 Cal.App.2d 729, 735, 748–749, 28 Cal.Rptr. 238 (1963) with the parenthetical, "court assumes that IWC regulations apply to persons who are domiciled in California but work principally outside the state." 14 Cal.4th at 578, 59 Cal. Rptr.2d 186, 927 P.2d 296. This directly contradicts Western's interpretation of Tidewater. Tidewater merely identified a "presumption" of application of California labor regulations to a certain class of workers, and certainly did not exclusively hold that only that class is entitled to protection.

Since Tidewater, the California Supreme Court found that California's overtime regulations apply to nonresidents performing work in California regardless of the amount of time spent working within the state's borders. Sullivan, 51 Cal.4th at 1205, 127 Cal.Rptr.3d 185, 254 P.3d 237. In a four year period, each of the three plaintiff-employees spent 74 days, 110 days, and

20 days working within the state's borders, respectively. Id. at 1195, 127 Cal.Rptr.3d 185, 254 P.3d 237. These plaintiffs therefore spent approximately 94.9 percent, 92.5 percent, and 98.6 percent of their time working in other states, yet the California Supreme Court still found California's overtime laws applied to the work each plaintiff performed within the state's borders. Id. Defendant argues that Sullivan cannot be applied to Plaintiff because the employer in Sullivan was a California employer, and because "Sullivan did not address whether the plaintiffs were wage earners of California." (Reply at 2.) However, this argument is not helpful to Western. That Sullivan did not address whether the plaintiffs were wage earners of California lends support to the claim that although residents working principally or exclusively within California are presumptively "California wage earners" under Tidewater entitled to the protection of the IWC regulations, other workers who spend less time working in California may still be entitled to the protection of California law.[19] The Court finds this especially true where the worker in question, like Yoder, is a California resident paying California taxes.

Western also relies on Sarviss v. Gen. Dynamics Info. Tech., Inc., 663 F.Supp.2d 883, 898 (C.D.Cal.2009) for the proposition that "because the plaintiff was not a wage earner of California, he was not entitled to the presumptive application of the Califor-

nia Labor Code." (Reply at 3.) Western's reliance is misplaced. The plaintiff in Sarviss did not claim any California Labor Code violations for time spent working within California, a point the Sarviss court emphasized repeatedly. See 663 F.Supp.2d at 897, 901. The court even stated, "It is perhaps undisputed here that 'California employment laws implicitly extend to employment occurring within California's state law boundaries.'" (citing Tidewater, 14 Cal.4th at 565, 59 Cal.Rptr.2d 186, 927 P.2d 296). Id. at 898. Rather, the Sarviss court analyzed whether the plaintiff could assert claims under California law for time spent working outside the state. Id. at 898–901. That is not the issue before this Court, and as such, Sarviss is inapposite.

The Court finds three district court cases within this circuit more persuasive. See Aguilar v. Zep, Inc., No. 13–CV–0563, 2014 WL 4245988 *12 (N.D.Cal. August 27, 2014) (finding "summary judgment is not proper to the extent [the plaintiff] can prove that [his employer] violated California laws relating to work he performed within California"); Wright v. Adventures Rolling Cross Country, Inc., No. C–12–0982 EMC, 2012 U.S. Dist. LEXIS 104378 *11 (N.D.Cal. May 3, 2012) (finding the plaintiffs had viable state law claims based on work done in California even though it represented only one-third of the time spent working for their employer); Maez v. Chevron Texaco Corp., No. 04–cv–00790 JSW, 2005 WL 1656908, *3 (N.D.Cal. July

19. Regarding Western's argument that Sullivan should not apply because the employer was a California employer, the Court directs Western to the text of Sullivan itself. Sullivan performed a conflict of laws analysis to determine whether a true conflict existed between the laws of the residents' home states and the state of California, and if so, which state's interest would be the more impaired if its law were not applied. 51 Cal.4th at 1202, 127 Cal.Rptr.3d 185, 254 P.3d 237. Western did not even attempt to provide this Court with

Tennessee employment laws, so the Court will not engage in a conflict of laws analysis. Western has failed to carry its burden on summary judgment as to this issue. Further, the Court notes that, even if a conflict exists, California's interest in protecting its own citizens is very high. De Canas, 424 U.S. at 356, 96 S.Ct. 933 ("states possess broad authority under their police powers to regulate the employment relationship to protect workers within the State") (emphasis added).

13, 2005) (denying summary judgment where questions of fact remained regarding whether the plaintiff's employer alleged failure to pay wages occurred while the plaintiff was working inside California).

In Aguilar, the defendant-employer, relying on Tidewater, argued that California's wage and hour protections do not apply to persons who live outside California and temporarily work in California. 2014 WL 4245988, *11. The court found this reliance misplaced. Id. Rather, citing to Tidewater and recognizing a general consensus among lower courts that "the critical factor is where the work at issue is performed," the court held that summary judgment was not proper to the extent the plaintiff could prove his employer violated California laws relating to work the plaintiff performed in California. Id. *12.

Similarly, in Wright, the plaintiffs were employees of a youth program administrator wherein the employees spent ten days in California for training purposes followed by 24 days abroad. 2012 U.S. Dist. LEXIS 104378, *3. The court recognized that the plaintiffs could not "be said to have worked principally in California when approximately two-thirds of their time was spent working abroad." Id. *15. However, the court resolved the issue by "focusing on the situs of employment," and concluded that the plaintiffs had viable claims based on their work performed in California. Id. *16–18.

Finally, in Maez, the plaintiff lived in Arizona but "his entire customer base was in California and the sole focus of his job was on generating sales in California." 2005 WL 1656908, *1. The evidence demonstrated that the plaintiff visited California "a couple of times every month for business." Id. *3. The court concluded that under Tidewater, "the exact scope of California's wage and hour laws is not clear," and held that "[t]he existence of [ ] questions regarding the scope of California law and the location of Plaintiff's employment precludes summary judgment on this issue." Id.

It was Western's burden to convince the Court that that "under the governing law, there can be but one reasonable conclusion as to the verdict." Anderson, 477 U.S. at 250, 106 S.Ct. 2505. This Western has not done. The Court agrees with the reasoning of the Aguilar, Wright, and Maez courts and finds summary judgment is not proper to the extent Plaintiff can prove that Western violated California laws relating to work he performed within California. See Wright, 2012 U.S. Dist. LEXIS 104378 *18; and Aguilar, 2014 WL 4245988, *12; Maez, 2005 WL 1656908, *3.

## IV. CONCLUSION

For the foregoing reasons, the Court DENIES Defendant's motion for summary judgment.

**IT IS SO ORDERED.**